IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )
                                     )
         v.                        )
                                     )   2:06cr233
RICHARD MCINTOSH,              )   Judge Thomas M. Hardiman
                                   )
         Defendant.       )

## MEMORANDUM OPINION

On June 27, 2006, a grand jury indicted Defendant Richard McIntosh on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §922(g)(1). On November 6, 2006, McIntosh filed a motion to suppress statements and physical evidence taken by police on May 23, 2006. An evidentiary hearing was held on December 15, 2006, and the motion is ripe for adjudication.

### I.    Findings of Fact

Pitt Loan, Inc. operates a pawn shop on Pittsburgh's North Side and fell victim to a two-man armed robbery on May 5, 2006. Both robbers were young black men who held pawn shop staff and customers at gunpoint while carrying out the robbery. The robbers escaped with twenty-one handguns and a large quantity of jewelry. Detectives from the Pittsburgh Police and agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives were called in to investigate the crime. (Tr. 4-5).

Soon after the robbery, authorities developed a Carrick resident, Kenneth Taylor, as a suspect. Taylor was apprehended on May 17, 2006, whereupon police recovered eight of Pitt

Loan's guns from his truck and his residence, along with some of the stolen jewelry. Taylor

provided a statement identifying himself and "Rickie McIntyre" as the robbers and furnishing an

account of the hold-up consistent with that received from eyewitnesses. He also admitted

traveling with his accomplice to Philadelphia after the robbery and selling four of the stolen guns

there, leaving six guns still unaccounted for by the agent's reckoning. Taylor said his accomplice

had the remaining guns. (Tr. 7-9).

On May 22, 2006, Taylor identified his accomplice from a police photo of Richard

McIntosh (not McIntyre). Police then learned that McIntosh had arrests and convictions for drug

trafficking and firearms offenses from 2000 through 2003. (Tr. 10-11).

On May 23, 2006, after surveilling McIntosh's residence in the Troy Hill section of

Pittsburgh for about an hour, at approximately 1:30 p.m., Special Agent Jeff Haggerty, Detective

Joe Bielewicz, and Detective Harry Lutton saw McIntosh alight from a public bus with a plastic

bag of groceries about two blocks away from his residence. McIntosh initially walked toward the

officers, *i.e.*, toward his own home, but then "would not make eye contact and made a left turn

probably a hundred feet before [the officers] and began walking away, down the block." The

officers then approached McIntosh on the sidewalk, identified themselves as law enforcement

officers, and Detective Lutton drew his Taser and pointed it at McIntosh while the other two

officers checked McIntosh for weapons. (Tr. 11-15).

While on the sidewalk, the officers told McIntosh that they were investigating the pawn

shop robbery. McIntosh said he was aware of the crime, but denied any involvement. At the

time, McIntosh was wearing jewelry that he claimed he bought in Philadelphia with Taylor.

When officers advised McIntosh that they had arrested Taylor for the pawn shop robbery,

McIntosh stated that his own fingerprints might be found on the stolen guns because he had handled some of them.  Agent Haggerty then suggested continuing their discussion at McIntosh's residence, as they were all standing on a city sidewalk.  McIntosh agreed, and the four men entered an unmarked police car.  McIntosh sat in the front passenger's seat with his groceries on his lap.  McIntosh was required to fasten his seat belt, but he was not handcuffed or otherwise restricted during the two-block ride to 1813 Niggel Street, Pittsburgh.  (Tr. 15-16, 53).

Upon their arrival at 1813 Niggel Street at around 2 p.m., McIntosh knocked a few times on the door before his girlfriend, Diane Brown, opened the door.  (Tr. 58).  McIntosh told Brown that the other men were police officers who wanted to talk to him.  Detective Bielewicz stayed in the front room with Brown and two children, an infant and a toddler, while McIntosh, Detective Lutton, and Agent Haggerty went to the kitchen where McIntosh sat at the table.  Lutton and Haggerty then left McIntosh in the kitchen and went to the back porch to discuss whether to issue *Miranda* warnings to McIntosh before asking him more questions.  Upon returning to the kitchen, Agent Haggerty advised McIntosh of his *Miranda* rights by reading them verbatim from a printed card he carried with his badge.  McIntosh indicated his understanding of the warnings and agreed to continue the interview.  (Tr. 17-20, 54, Ex. 2).

During the interview, McIntosh said that Diane Brown was a good friend of Taylor's wife, Jamira.  McIntosh knew where Taylor lived and had socialized there many times.  He said he had "helped himself" to some of the jewelry and had seen Taylor with the stolen guns.  McIntosh described himself as a drug trafficker and acknowledged arranging for his sister's boyfriend, another drug trafficker named Mar, to buy two of the guns Taylor had taken in the pawn shop robbery.  McIntosh also said that he and Taylor had traveled together to Taylor's

hometown of Philadelphia, where they sold some of the jewelry and guns stolen in the same robbery. (Tr. 21-24).

McIntosh acknowledged that the jewelry he was wearing was also stolen from the pawn shop and agreed to turn it over. He balked concerning one ring, but ultimately conceded that it too had come from the robbery of Pitt Loan. McIntosh said that none of the guns taken from the pawn shop were in the residence, prompting the officers to ask if *any* guns were in the house. McIntosh replied that one gun was upstairs, disclosing its precise location. (Tr. 25-26).

Shortly after 3:30 p.m., officers asked McIntosh if they might have consent to search the residence. (Tr. 58). McIntosh and Brown, the lessee of the Niggel Street residence, were allowed to confer privately to discuss that request; at 3:54 p.m., they agreed, as shown by a pre-printed consent form executed by both McIntosh and Brown and witnessed by the officers. (Tr. 38; Ex. 1). Additional officers arrived at the residence, whereupon a search took place, yielding the handgun described in the instant indictment, numerous items of jewelry ultimately traced to the pawn shop robbery, indicia of residency, and a pistol holster previously observed by Detective Lutton in plain view above the fireplace before the search took place. McIntosh acknowledged that the gun seized was his and that he was not allowed to possess a gun because of his criminal record. Accordingly, police handcuffed McIntosh and placed him under arrest. (Tr. 25-32).

McIntosh then was taken to police headquarters and transferred to an interview room. Once there, he persisted in denying his involvement in the pawn shop robbery. At one point, he offered to confess to the crime if the officers "wanted him to," an offer the officers declined on those terms. They then confronted McIntosh with a police artist's sketch based on an eyewitness

4

interview which caused McIntosh to become upset, although he insisted that the sketch did not

resemble him.  Almost immediately thereafter, McIntosh asked for a lawyer, whereupon

questioning ceased, and Pittsburgh Police booked McIntosh on the §922(g)(1) violation.  (Tr.

33-34, 64-65).

Special Agent Haggerty was the sole witness at the hearing.  The Court found his

testimony credible in all respects, and McIntosh's cross-examination of Haggerty did not alter the

facts established in Haggerty's testimony on direct examination.


II.     **Analysis**

> *A.     Whether the Officers' Initial Interaction with McIntosh Violated the Fourth*
> *Amendment*

Under Supreme Court case law interpreting the Fourth Amendment, police officers may

conduct a "brief, investigatory search" if they have "reasonable, articulable suspicion that

criminal activity is afoot." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (citing

*Terry v. Ohio*, 392 U.S. 1, 27 (1968)); *accord United States v. Arvizu*, 534 U.S. 266, 273 (2002)

("Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood

of criminal activity need not rise to the level required for probable cause, and it falls considerably

short of satisfying a preponderance of the evidence standard." (internal citations omitted)).  The

reasonable suspicion upon which an officer relies to institute a *Terry* stop and frisk must "be

based upon specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant that intrusion.  In determining whether a stop is justified, the

court must view the circumstances surrounding the stop in their entirety, giving due weight to the

experience of the officers." *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) (internal quotation marks and citations omitted).

In the case at bar, the Government stipulates that the encounter on the sidewalk was a *Terry* stop (Tr. 69), so the Court need not analyze whether it qualifies as a citizen encounter under *Florida v. Bostick*, 501 U.S. 429, 434 (1991). *See, e.g., United States v. Jenkins*, 181 Fed.Appx. 168, 170 (3d Cir. 2006). McIntosh first argues that, assuming the officers initiated a *Terry* stop, they had no authority to do so because criminal activity was not afoot on May 23, 2006, as the criminal activity they were investigating, *viz.*, the Pitt Loan robbery, occurred on May 5, 2006.

Defendant's interpretation of criminal activity being afoot is too narrow and finds no support in the law. *Terry* stops are not limited to the investigation of criminal activity that is imminent or contemporaneous with the stop itself. *See United States v. Brown*, 448 F.3d 239, 244 n.7 (3d Cir. 2006). Moreover, Taylor gave his tip to the police on May 22, 2006, only one day prior to their investigatory stop of McIntosh. Finally, there is no question that "reasonable suspicion can be based on information gathered from another person." *United States v. Robertson*, 305 F.3d 164, 168 (3d Cir. 2002).

Although McIntosh does not appear to make it, there is also no viable argument that the officers did not have reasonable, articulable suspicion of McIntosh's involvement in criminal activity at the time of the *Terry* stop. In analyzing whether an officer had reasonable suspicion, courts "must consider the totality of the circumstances – the whole picture." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (internal quotation marks and citations omitted). Taylor provided his tip only a day earlier, and he did not merely provide a general description of

6

McIntosh, but also a photo identification of McIntosh.  On May 23, 2006, the officers had at least reasonable suspicion that the man they saw was indeed McIntosh because they were standing in front of his residence, and he closely resembled the man Taylor had identified in the photograph. (Tr. 13).  The Court of Appeals has found reasonable suspicion on much less.  *See, e.g., id.* at 357.

Moreover, "the significance of furtive actions and flight" is applicable to *Terry* stops and can provide the individualized suspicion sufficient to justify a *Terry* frisk.  *United States ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1972).  In the instant case, when McIntosh saw the three officers, he avoided eye contact, changed course, and walked away from his own residence.  When the police then approached McIntosh, cognizant of Taylor's tip and photo identification, they indubitably had reasonable suspicion that McIntosh was connected to the Pitt Loan robbery.

Nor did the officers do anything during the *Terry* stop to violate the Fourth Amendment. In *Ybarra v. Illnois*, 444 U.S. 85 (1979), the Supreme Court reiterated that the scope of *Terry* frisks must remain limited to the specific purposes and justifications that support them.  *Id.* at 93. Concerned for their safety, the officers here conducted a brief pat-down of McIntosh, a likely suspect in an armed robbery.  (Tr. 15).  This frisk for weapons did not exceed *Terry*'s scope.  Nor did their questioning exceed *Terry*.  *See Rickus*, 737 F.2d at 366 ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

Finally, McIntosh's consent to enter and ride in the police vehicle was not involuntary.

Because McIntosh does not point to any specific facts to show involuntariness, the Court will analyze whether any fact surrounding the *Terry* stop vitiated valid consent. In *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004), a case in which a *Terry* stop had more indicia of police authority than the case at bar, the Eleventh Circuit held that the suspect's consent to search a duffel bag was voluntary. *Id.* at 1151. Compared to the facts of *Acosta*, McIntosh's consent to return home to continue police questioning was plainly voluntary. First, the police suggested moving away from the sidewalk only after McIntosh affirmatively expressed his desire to spill the beans about Taylor. Second, Agent Haggerty merely "suggested that, we were standing at the street corner, he had some groceries, or seeing [] a bag in his hand, I suggested we talk somewhere else and suggested that his residence was nearby." (Tr. 48). At no point did any of the officers insist on going to McIntosh's home. Nor did any of the officers insist that McIntosh ride in the police vehicle; the ride was merely a convenient way for four people to reach their destination. (Tr. 16). Under these circumstances, McIntosh's consent to return home with the officers in their vehicle was voluntary.

For all the foregoing reasons, the officers' conduct during their *Terry* stop of McIntosh did not violate his Fourth Amendment rights.

B.    *Whether the Officers' Initial Interaction with McIntosh Violated the Fifth Amendment*

As for his Fifth Amendment claim, McIntosh argues that he provided incriminating answers to questions on the sidewalk while "in custody," both as a result of the number of officers present and the fact that one drew a weapon. It follows under that theory that McIntosh's answers must be suppressed because they were not preceded by the warnings required by

*Miranda v. Arizona*, 384 U.S. 436, 443 (1966). *See Dickerson v. United States*, 530 U.S. 428, 440 (2000). A suspect is "in custody" for *Miranda* purposes if he has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (internal citation omitted).

As an initial matter, *Terry* seizures and *Miranda* custodial interrogations are analytically distinct, for it is settled law that during a *Terry* stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without first giving *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Fornia-Castillo*, 408 F.3d 52, 63 (1st Cir. 2005) ("[a]s a general rule, *Terry* stops do not implicate the requirements of *Miranda*" (internal citation omitted)); *Acosta*, 363 F.3d at 1149 ("If the lack of freedom to leave were decisive, which is to say if every phrase in the *Miranda* opinion is to be applied literally, then . . . all *Terry* stops generally would be subject to the requirements of that decision. *Berkemer* establishes that they are not."); *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003) ("most *Terry* stops do not trigger the detainee's *Miranda* rights").[1]

The issue here, then, is whether the *Terry* stop in this case contains such indicia of custody as defined in *Stansbury* and *Berkemer* as to render *Miranda* warnings necessary before

---

[1] For further exposition of the interrelation between *Terry* and *Miranda*, see *Cruz v. Miller*, 255 F.3d 77, 85 (2d Cir. 2001) ("We have recognized that a *Terry* stop may turn into custodial detention, but we seem to have placed considerable weight on whether the suspect feels 'free to leave,' without acknowledging that in all *Terry* stops (and traffic stops), the suspect does not feel free to leave, at least not while the permitted (brief) questioning is occurring." (internal quotation marks and citations omitted)).

McIntosh was questioned. To assess whether a suspect is in custody for *Miranda* purposes:

> Courts consider a variety of factors . . . including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). Courts analyze these factors

under the totality of the circumstances in order to answer the following ultimate question:

> whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Where . . . the individual has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.

*United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal quotation marks and citations

omitted).

Applying the *Willaman* factors, the Court concludes that McIntosh was not "in custody"

while stopped on the sidewalk. First, although the officers did not tell McIntosh that he was free

to leave, they also never told him that he was under arrest. Second, the location and physical

surroundings of the interrogation both favor the Government because it was early afternoon in

late spring on a public street. Third, the length of the interrogation favors the Government

because the encounter consisted of a pat-down, information from the officers about what they

were investigating, and three questions before McIntosh consented to giving further details in his

residence. (Tr. 14-16).[2] Fourth, other than the Taser gun, which merits further explication, *infra*,

---

[2] McIntosh asserts a time period of "more than five minutes." Even that amount of time, however, is shorter than many of the interrogations that the Supreme Court and various courts of appeals

the officers neither displayed any weapons, nor used hostile tones of voice or otherwise restrained McIntosh's physical movement, as handcuffs were not used during the initial stop or the brief ride to McIntosh's residence.  Fifth, McIntosh voluntarily submitted to questioning, as it was McIntosh who "expressed an interest in giving us details about Mr. Taylor and his involvement with the guns and jewelry" and "indicated that he would be more than happy to talk to us about Ken Taylor, the firearms, and stolen jewelry." (Tr. 16, 47).

In response, McIntosh points to the drawing of a Taser by Detective Lutton as the critical fact in the officers' "manner of approach" that transformed the valid *Terry* stop into "custody" for *Miranda* purposes.  In *United States v. Lee*, 317 F.3d 26 (1st Cir. 2003), however, the First Circuit held that "actions such as unholstering a weapon and obstructing a vehicle's path do not, as a matter of law, transmogrify an otherwise lawful *Terry* stop into a de facto arrest." *Id.* at 32. In *United States v. Leshuk*, 65 F.3d 1105 (4th Cir. 1995), the Fourth Circuit held that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes." *Id.* at 1109-10.  The Second Circuit also collected cases in which "courts have ruled that an initial display of guns, subsequently reholstered, does not result in 'custody' that requires *Miranda* warnings." *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (citing cases from the Fourth, Seventh, and Ninth Circuits).

Here, Detective Lutton drew his Taser on a public sidewalk while the other two officers checked McIntosh for weapons.  In addition to their concerns about weapons from the recent

---

have held to be non-custodial for purposes of *Miranda*. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (thirty minutes); *United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005) (slightly over thirty minutes).

11

robbery, the officers' decision was influenced by what they knew about McIntosh's criminal record. (Tr. 15). Once the officers were assured that McIntosh had no weapons after the brief pat-down, Lutton re-holstered his Taser. That Lutton drew his Taser in a "defensive posture" is also a factor that convinced the First Circuit that there was no custody in a similar case. *See Fornia-Castillo*, 408 F.3d at 57 n.3 & 64. Similarly, the fact that there were three officers instead of one did not so add to the stop as to curtail McIntosh's freedom of movement to a degree associated with formal arrest. *See, e.g., United States v. Trueber*, 238 F.3d 79, 94 (1st Cir. 2001); *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995). In light of the totality of the circumstances, Lutton's decision to draw his Taser and the presence of three officers do not overcome the remaining factors that all point toward McIntosh not being in custody for purposes of *Miranda*. Accordingly, McIntosh was not entitled to *Miranda* warnings before being questioned on the sidewalk, and McIntosh's statements will not be suppressed.[3]

C.      *Constitutionality of the Officers' Subsequent Interactions with McIntosh*

The remaining constitutional challenges from Defendant's initial motion to suppress, *see* Mot. to Suppress at ¶13a-f, do not merit detailed discussion. First, regardless whether the police actually had probable cause to detain McIntosh on the street, they did not need it under *Terry*. Second, the frisk of McIntosh occurred within the permissible scope of *Terry*, and he was not searched in any other fashion while on the street. Third, both McIntosh and Brown consented to the police's entry and search of 1813 Niggel Street. It follows that a search warrant was not required, as voluntary consent is an exception to the warrant and probable cause requirements.

---

[3] McIntosh does not argue that his subsequent *Miranda* waiver at around 2 p.m. in his residence was invalid. (Tr. 19).

*United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).  And although McIntosh argues that his consent to return home with the officers during the *Terry* stop was involuntary, an issue the Court has already resolved against him, his only argument as to involuntary consent to the subsequent search was that the police conducted the search "without any informed consent by Diane Brown or the defendant."  The facts plainly refute such an allegation, for Brown and McIntosh both signed the consent to search form (Ex. 1), "they were told that they were under no pressure whatsoever to sign that form . . . multiple times" (Tr. 60), and they had a private discussion about whether to consent before actually doing so.

Hence, as the Court expressed tentatively at the evidentiary hearing (Tr. 70-71), the overarching question is whether the police lawfully conducted a *Terry* stop under the circumstances and, if so, whether they were required to issue *Miranda* warnings during the sidewalk encounter.  The Court has answered both questions in favor of the Government.  Accordingly, the ensuing events, *i.e.*, entry into the residence, interrogation in the kitchen, search of the residence, and seizure of the contraband, were not fruit of the poisonous tree.[4]  In addition, these ensuing events did not independently violate the Fourth (or Fifth) Amendment because they were consensual (or the result of a valid *Miranda* waiver), and the consent and waiver were not the product of coercion.

Consequently, the statements McIntosh made and the physical evidence found in his residence will not be suppressed.

---

[4] Even if McIntosh were deemed "in custody" during the *Terry* stop, his subsequent consent may be a sufficient intervening attenuating circumstance that breaks the chain of poisonous taint.  *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

### III.    Conclusion

For the foregoing reasons, McIntosh's motion to suppress statements and physical

evidence will be denied.  An appropriate Order follows.


February 6, 2007

_____
Thomas M. Hardiman
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )
                                )
            v.                  )
                                )   2:06cr233
RICHARD MCINTOSH,               )   Judge Thomas M. Hardiman
                                )
            Defendant.          )

## ORDER

AND NOW, this 6th day of February, 2007, upon due consideration of Defendant's

Motion to Suppress (Doc. No. 50), the Government's response thereto (Doc. No. 51), as well as

the supplemental briefing submitted by Defendant and the Government (Docs. Nos. 56 & 57), a

hearing having been held on December 15, 2006, it is hereby

ORDERED that said motion is DENIED for the reasons set forth in the Memorandum

Opinion filed herewith.

BY THE COURT:

Thomas M. Hardiman
United States District Judge